

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00312-CR

| | | |
|---|---|---|
| Haywood Henderson | § | From the 396th District Court |
| | § | of Tarrant County (1210389D) |
| v. | § | November 21, 2012 |
| | § | Opinion by Chief Justice Livingston |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Chief Justice Terrie Livingston



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00312-CR

HAYWOOD HENDERSON          APPELLANT

V.

THE STATE OF TEXAS          STATE

----------

## FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In two issues, appellant Haywood Henderson appeals his felony conviction for driving while intoxicated (DWI).[2] Appellant contends that the trial court erred by denying his request to judicially notice the language of a section of the administrative code and by overruling his objection to part of the State's closing argument concerning his guilt. We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Penal Code Ann. §§ 49.04(a), .09(b)(2) (West Supp. 2012).

2

**Background Facts**

One afternoon in August 2010, Fort Worth Police Department (FWPD) Officer Chris Daniels was patrolling the western part of Fort Worth. Officer Daniels saw appellant driving a car that had an expired registration sticker, so Officer Daniels conducted a traffic stop. Appellant did not drive too fast, weave, brake improperly, or run stop signs in the approximately five to ten seconds that Officer Daniels watched appellant's driving.

When Officer Daniels asked to see appellant's driver's license, appellant gave Officer Daniels a credit card. Appellant was coherent, but Officer Daniels noticed a strong smell of an alcoholic beverage coming from appellant's car or his breath. Officer Daniels also saw that appellant had bloodshot and watery eyes and used "slurred, thick, [and] kind of loud speech."[3] Officer Daniels asked appellant if he had been drinking alcohol, and appellant responded that he had not had any beers since the previous night. Appellant conceded, however, that he had beers inside his car. When appellant got out of the car, Officer Daniels still smelled alcohol on him.

Appellant performed field sobriety tests. According to Officer Daniels, appellant showed six out of six signs of intoxication on the horizontal-gaze-nystagmus test, four out of eight signs on the walk-and-turn test, and three out of

---

[3]At trial, appellant's wife testified that he has bloodshot eyes on a regular basis because of irritation from when he was a welder and from when he cut down trees.

four signs on the one-leg-stand test. Officer Daniels arrested appellant and placed him in the backseat of the patrol car. When Officer Daniels searched appellant's car, he found two twenty-four-ounce beer cans in the car that were mostly empty.

In the patrol car, appellant was able to take his handcuffs from behind him and bring them underneath his legs to the front of his body, at which time he reached his cell phone and called his wife and his sister. Appellant volunteered to take a breath test, and Officer Daniels took him to the Tarrant County Sheriff's Office, where Officer Daniels gave appellant a statutory warning about the test. Appellant blew into a breathalyzer machine two times, and the machine registered his alcohol concentration at .245 and .239, each of which is about three times the legal limit.[4]

A grand jury indicted appellant for DWI. The indictment contained paragraphs alleging that he had been previously convicted for DWI twice and had also been convicted for committing two felony offenses.[5] Appellant pled not guilty. At trial, Officer Daniels conceded that appellant was not "falling down drunk" but explained that he had based his arrest of appellant on his

---

[4]*See id.* § 49.01(2)(B) (West 2011).

[5]DWI is a third-degree felony when a defendant has two prior DWI convictions. *Id.* § 49.09(b)(2). When a defendant is convicted for a third-degree felony while having two prior, sequential felony convictions, the defendant faces a term of "life, or for any term of not more than 99 years or less than 25 years." *Id.* § 12.42(d) (West Supp. 2012).

4

performance of the field sobriety tests; his unsteady balance; his bloodshot, watery, and heavy eyes; his slurred and loud speech; and the "strong odor of an alcoholic beverage coming from his person."  Officer Daniels also stated, among other facts, that people may have natural nystagmus without drinking alcohol; that he took seventy-three seconds to complete the horizontal-gaze-nystagmus test, which should normally take less time; that taking too long to conduct that test may induce nystagmus; that appellant did not have vertical nystagmus (which would have indicated that appellant was "very intoxicated"); that he was not able to record the statutory breath-test warnings that he gave to appellant; and that appellant was coherent and retained his fine motor skills during his detention.

The jury convicted appellant.[6]  Appellant pled true to the habitual felony offender notice in the indictment, and after the parties presented evidence concerning his punishment, the trial court sentenced him to thirty years' confinement.  He brought this appeal.

### Judicial Notice

In his first issue, appellant contends that the trial court erred by denying his request to take judicial notice of the contents of title 37, section 221.9 of the administrative code (section 221.9) as that section existed on the date of his

---

[6]Appellant's indictment simply alleged that he operated a motor vehicle in a public place while intoxicated.  The jury charge stated, "'Intoxicated' means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, or having an alcohol concentration of 0.08 or more."

arrest. During the State's initial questioning of Officer Daniels, he testified that he had received training in detecting signs of intoxication, that he was qualified to investigate DWIs, that he had become certified at some point to administer field sobriety tests, that the FWPD did not require him to annually update that certification, and that he had maintained the certification. On cross-examination, Officer Daniels testified that he had completed field sobriety training in 2006. He said, however, that he had not updated that certification and that he was not aware that the Texas Commission of Law Enforcement Officer Standards and Education (TCLEOSE) required recertification in conducting field sobriety tests every two years. During the cross-examination by defense counsel, the following exchanges occurred:

> Q. You are aware of the fact that TCLEOSE says you have to get certified every two years?
>
> A. No.
>
> . . . .
>
> Q. . . . Isn't it true, Officer Daniels, you're supposed to recertify every two years?
>
> . . . .
>
> [A.] I'm not aware of that. . . .
>
> . . . .
>
> Q. Would it be asking too much of you to verify that you are supposed to recertify every two years?
>
> A. I wasn't aware of that. If that is, in fact, the rule, I wasn't aware of that.

Q. Okay. Let me ask you this. If that was . . . in fact, the rule, . . . you were not certified, were you?

A. It would depend on what the criteria is for the certification. If routine practice of the DWI [field sobriety tests] is sufficient enough for certification, then, yes, I conduct [DWI tests] fairly often.

. . . .

Q. And if TCLEOSE says you're supposed to requalify every two years, on August 16th, 2010, you were not certified, were you, if that's the case? If that's the rule?

A. It would depend on the criteria for the recertification. I'm not sure what that criteria is.

On redirect-examination, Officer Daniels said that he was not a field sobriety testing "practitioner" but rather simply administered field sobriety tests (although Officer Daniels had previously testified that he was a practitioner), that he had never claimed to hold a practitioner's certificate, that he had never learned in his training about a recertification requirement for administering field sobriety tests, and that he did not need a practitioner's certificate to testify about field sobriety tests. Upon further cross-examination, Officer Daniels conceded that he did not know what a field sobriety testing "practitioner" was.

After all of the State's witnesses had testified, a prosecutor asked the trial court to take judicial notice that section 221.9, which concerned field sobriety testing certifications, had been repealed as of July 14, 2011 (which was a week before the trial occurred). Appellant objected to the State's request on the ground that his crime occurred before the repeal date. The State withdrew its request, but appellant then asked the court to take judicial notice of the language

7

of section 221.9 before it was repealed, including that a standardized field sobriety practitioner was required to recertify every two years.[7] Appellant contended that if the trial court did not take judicial notice of section 221.9, the jury would be left with a "false and misleading impression" about whether Officer Daniels was required to recertify. After prosecutors and appellant's counsel offered arguments concerning whether Officer Daniels was a "practitioner" who was subject to section 221.9's requirements, the trial court denied appellant's request for judicial notice, stating,

> I think the fact that you guys have spent 15 minutes arguing back and forth about what the law is, is a prime example of when the Court, in its discretion, does not have to take judicial notice of particular laws because there is apparently wide disagreement as to what the law is and whether it applies to the individual officer in this case, which would then fall to either party to provide evidence of, instead of the Court taking judicial notice of.
>
> So I'm going to deny your request to take judicial notice of section 221.9 . . . .

Appellant asserts that the trial court erred by denying his request to take judicial notice of section 221.9 as it existed on the date of his offense. Rule of evidence 204 states in part, "A court upon its own motion may, or upon the motion of a party shall, take judicial notice of . . . the codified rules of the

---

[7]*See Goains v. State*, No. 09-09-00503-CR, 2011 WL 4537892, at *2 (Tex. App.—Beaumont Sept. 28, 2011, pet. ref'd) (mem. op., not designated for publication) (explaining that the 2009 version of section 221.9 required recertification for standardized field sobriety testing every two years), *cert. denied*, 81 U.S.L.W. 3164 (U.S. Oct. 1, 2012). Section 221.9 was repealed in 2011 because training for standardized field sobriety testing is now included in the "Basic Peace Officer Course." *See id.* at *3 n.1.

8

agencies published in the Administrative Code. . . .  The court's determination shall be subject to review as a ruling on a question of law."  Tex. R. Evid. 204.

Even if the trial court erred by not taking judicial notice of the contents of section 221.9 as of the date of appellant's offense, unless appellant has been harmed by that error, we must still affirm the trial court's judgment.  *See Walker v. State*, 300 S.W.3d 836, 852 (Tex. App.—Fort Worth 2009, pet. ref'd).  When error is not of a constitutional dimension, rule of appellate procedure 44.2(b) applies.  *See* Tex. R. App. P. 44.2(b).  Under rule 44.2(b), any nonconstitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.*

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.  *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  Conversely, an error does not affect a substantial right if we have Afair assurance that the error did not influence the jury, or had but a slight effect.@  *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury=s consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with evidence in the case.  *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App.

9

2002). We may also consider the jury instructions, the State=s theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56. "[T]he proper inquiry is whether the trial court's error . . . substantially swayed or influenced the jury's verdict, or whether we are left in grave doubt as to whether [the error] substantially swayed or influenced the jury's verdict." *Russell v. State*, 113 S.W.3d 530, 550 (Tex. App.—Fort Worth 2003, pet. ref'd).

Appellant admits that Officer Daniels's testimony about appellant's performance on standardized field sobriety tests was properly admitted even if Officer Daniels was not certified as a practitioner at the time of the tests.[8] But appellant contends that he was harmed by the trial court's refusal to judicially notice section 221.9 because the court's doing so could have impacted the jury's view of Officer Daniels's credibility. Specifically, appellant argues, "The field sobriety tests administered by Officer Daniels were a vital part of the State's

---

[8]While a practitioner's certification in standardized field sobriety testing traditionally qualified an officer to conduct such tests and to testify about them in court, such a certification was not required to make an officer's testimony about the tests admissible as long as the officer adequately demonstrated through training and experience that he was qualified to conduct the tests and to testify about them. *See Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim. App.), *cert. denied*, 513 U.S. 931 (1994); *Kerr v. State*, 921 S.W.2d 498, 502 (Tex. App.—Fort Worth 1996, no pet.); *see also Goains*, 2011 WL 4537892, at *2. Officer Daniels became a certified peace officer in 2006. While training in the police academy, using standardized field sobriety tests, he examined up to forty people who had consumed various amounts (or no amount) of alcohol to determine whether they were intoxicated. In 2009, he attended an eight-hour DWI training seminar. Officer Daniels had investigated approximately twenty DWIs when he testified.

10

case. . . . Officer Daniels'[s] credibility was therefore critical. The trial court's ruling deprived Appellant, and the jury, of important information that would have adversely impacted Officer Daniels'[s] credibility."

We are unconvinced that the trial court's judicial notice of section 221.9 was likely to affect jurors' views of Officer Daniels's credibility in the sense of raising doubts about his truthfulness, as appellant argues in his brief. The portions of Officer Daniels's testimony that we have quoted above demonstrate that he was unaware of any biennial recertification requirement, not that he affirmatively denied that such a requirement existed. Appellant concedes in his brief that Officer Daniels did not "appear to know what recertification would entail." Thus, while judicial notice of section 221.9 could have shown that Officer Daniels was unaware of a recertification requirement that he did not comply with, such judicial notice was not likely to indicate to jurors that he lied about the requirement or was not generally truthful.

Also, we reject appellant's argument that the trial court's taking judicial notice of section 221.9 "had the potential to undermine jurors' opinion[s] of Officer Daniels'[s] expertise in the area of field sobriety testing." The record does not reflect what comprised the recertification process, so there were no facts presented to the jury to establish that by recertifying, Officer Daniels would have obtained any information or technique related to field sobriety tests that he had not already learned and was not already applying in his DWI investigations. Thus, instead of undermining jurors' opinions of Officer Daniels's expertise in

11

field sobriety testing, judicial notice of section 221.9 was more likely to merely lessen jurors' opinions of his expertise in the certification process, which did not strongly correlate to the issue of appellant's guilt.

Finally, appellant concedes that the evidence of his guilt was "substantial." The record supports this concession. Tarrant County Sheriff's Office Detention Officer Ty Gregory testified that he had been operating breathalyzer machines for two and a half years, that he had been certified to operate the machines after completing a forty-hour class, and that he had administered appellant's breath test in August 2010. Officer Gregory said that before he had given appellant the breath test, he had watched appellant continually for fifteen minutes to ensure that appellant had not burped or regurgitated alcohol, which could affect the results of the test. Officer Gregory explained that the machine was working properly on the date that appellant used it and that he had never known of a breathalyzer machine that had problems. The machine had correctly tested a controlled reference sample of alcohol before appellant used the machine.

Mark Fondren, a senior forensic chemist with the Tarrant County Medical Examiner's Office who is board certified in forensic alcohol toxicology, testified that he had been managing an alcohol breath testing program for seventeen years and that when performed correctly, breath tests can be as accurate as blood tests for measuring alcohol concentrations. Fondren told the jury about the scientific theory behind breathalyzer machines, and he opined that breathalyzers, which are used in "every county in the state of Texas," reliably measure the

alcohol in a person's body. Fondren confirmed that Officer Gregory was certified as a breathalyzer operator on the date of appellant's breath test, and he stated that the particular machine that appellant had used had been certified by the scientific director of the Department of Public Safety (DPS). In fact, Fondren had tested the machine that appellant used (which had been in service between a year and eighteen months) in both July and August 2010, and DPS had also randomly checked the machine to ensure that it was working properly. The machine was last tested four days before appellant used it, and it passed tests on five occasions within ten days after appellant used it, but its source of infrared energy was "out" by August 26, 2010, which was ten days after he used it.[9] Fondren testified that if the machine's infrared energy source had been malfunctioning when appellant used the machine, the machine would not have been operable. Fondren stated that appellant's breath samples registered alcohol concentrations of .245 and .239. He explained that he expects two breath samples to measure at different levels of alcohol concentration.

Fondren opined that an individual's outward appearance may be a poor indicator of his alcohol concentration because "[s]ome individuals at very high levels of alcohol look very good," particularly when they have had significant experience with drinking alcohol. When appellant's counsel asked Fondren

---

[9]Fondren explained that such sources go "out about every 18 months or so, which is why [he schedules] preventative maintenance."

whether he would expect to see outward signs of intoxication in a person who has a high alcohol concentration, Fondren said,

> [I]n a large group, yes. We do categorize various signs. Whether or not one individual shows that sign . . . , I don't know. The only way to know that is to dose an individual and determine that.
>
> . . . .
>
> With a large number of people, . . . you would expect to see some of those individuals show those signs.

Fondren explained that "[w]ithout a doubt," breath tests are a more reliable measure of intoxication than looking at an individual's outward signs of intoxication. Fondren opined on cross-examination that for a 220-pound person to reach an alcohol concentration of .24 in three hours of drinking alcohol, the person would need to consume sixteen to eighteen twelve-ounce beers in that three-hour period.

It is relevant to our harm analysis, although not necessarily dispositive, that even if the trial court's judicial notice of section 221.9 could have affected Officer Daniels's credibility, the jury could have convicted appellant based only on these facts, which are unrelated to his performance on field sobriety tests. *See* Tex. Penal Code Ann. § 49.01(2)(B) (stating that a person becomes intoxicated by having an alcohol concentration .08 or more); *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) ("Evidence of the defendant's guilt should be considered, but that is only one factor in the [harm] analysis."); *Bagheri v. State*, 119 S.W.3d 755, 762 (Tex. Crim. App. 2003) (explaining that the definitions contained in

14

section 49.01 set forth alternate means by which the State may prove intoxication); *Motilla*, 78 S.W.3d at 357–58.

For all of these reasons, we conclude that even if the trial court erred by not taking judicial notice of the contents of section 221.9 as of the date of appellant's offense, the error did not have a substantial and injurious effect on the jury's guilty verdict, and there is therefore no harm. *See* Tex. R. App. P. 44.2(b); *King*, 953 S.W.2d at 271. We overrule appellant's first issue.

## The State's Plea for Law Enforcement

In his second issue, appellant contends that the trial court erred by overruling his objection to part of the State's closing argument concerning his guilt, in which the following exchange occurred:

> [THE STATE:] My question to you is, do you want him at that alcohol level driving next to you? Do you want him driving on the same streets that your children are driving on with that alcohol level?
>
> [DEFENSE COUNSEL]: I'm going to object. That's improper argument. Attempts to strike fear into the jury. Has nothing to do with this case.
>
> THE COURT: Overruled.
>
> [THE STATE]: Do you want him driving with that alcohol level next to your mother or your father, your husband or your wife? Of course you don't. Driving while intoxicated is a very serious offense. We know the repercussions that come from this. We just want you to hold him accountable for what he has done.

We review a trial court's ruling on an objection to a jury argument for an abuse of discretion. *See Lemon v. State*, 298 S.W.3d 705, 707 (Tex. App.—San Antonio 2009, pet. ref'd); *Montgomery v. State*, 198 S.W.3d 67, 95 (Tex. App.—

15

Fort Worth 2006, pet. ref'd).  To be permissible, the State's jury argument must be a summation of the evidence, a reasonable deduction from the evidence, an answer to an argument of opposing counsel, or a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009); *Alami v. State*, 333 S.W.3d 881, 891–92 (Tex. App.—Fort Worth 2011, no pet.).

Appellant contends that a closing argument that "asks the jurors to abandon their objectivity and place themselves into the shoes of the victim . . . is improper."  In this case, however, there was no discernible victim, and the State did not reference one, so the cases cited by appellant are distinguishable.  *See, e.g.*, *Boyington v. State*, 738 S.W.2d 704, 709 (Tex. App.—Houston [1st Dist.] 1985, no pet.) (holding that a prosecutor's closing argument on punishment was improper when the prosecutor stated in part, "*Put yourself in the place of that Anderson family and imagine that was your family that was firebombed in the middle of the night.  Imagine that it was your son that ha[d] his legs on fire. . . . Would you want mercy shown?*").

The State argues that under the rationale we recently expressed in *Burton v. State*, the argument in this case, instead of being an improper invitation for jurors to place themselves in the shoes of a victim, was a proper plea for law enforcement.  No. 02-11-00144-CR, 2012 WL 1034920, at *5–8 (Tex. App.—Fort Worth Mar. 29, 2012, no pet.) (mem. op., not designated for publication).  In *Burton*, during the prosecutor's closing argument in the guilt phase of a trial for

16

DWI, the prosecutor said in part, "What harm are we trying to prevent with DWIs? We're trying to prevent four Brock cheerleaders from getting killed. We're trying to prevent somebody from driving one way on I–35." *Id.* at *5 (footnote omitted). After discussing several decisions from the court of criminal appeals that approved of similar arguments, we held that because the argument "informed the jury that by enforcing the DWI law, the State was seeking to prevent DWI-related deaths," it could have reasonably been construed as a proper plea for law enforcement. *Id.* at *6–8; *see Nichols v. State*, 504 S.W.2d 462, 465 (Tex. Crim. App. 1974) (holding that it was "nothing more than a plea for law enforcement" when the prosecutor argued in a DWI case, "I ask you to find the defendant guilty and all those like him because we are all going to get in our cars, and we are going to go home."); *Strahan v. State*, 172 Tex. Crim. 478, 479, 358 S.W.2d 626, 627 (1962) (concluding that a prosecutor properly appealed for law enforcement in a DWI case when the prosecutor urged the jury to think of people who travel on highways and stated, "When you and your family are on these highways driving you can't help but sometimes wonder if some drunk driver is going to hit you, run over you[,] and kill you.").

Based on the rationale and precedent discussed in *Burton*, we hold that the trial court did not abuse its discretion by overruling appellant's objection to the State's closing argument in this case because the argument may be reasonably construed as a plea for law enforcement. *See* 2012 WL 1034920, at *6–8; *see also DeBolt v. State*, 604 S.W.2d 164, 169–70 (Tex. Crim. App.

17

[Panel Op.] 1980) (approving of an argument in the guilt phase of a murder case when the prosecutor stated, "I'm mainly concerned [that the defendant] is not out among the public, living next door to me or next door to you or to anybody else."); *Rodgers v. State*, 168 Tex. Crim. 386, 387–88, 328 S.W.2d 301, 302 (1959) (holding that the prosecutor properly pled for law enforcement by arguing in a DWI case concerning a defendant who was a mail carrier, "[Y]our verdict in this case will tell . . . whether you are in favor of letting drunk drivers roam over the highways . . . without fear of being punished. You'll be just as dead, whether you are killed by a drunk mail carrier or some other drunk."); *Francis v. State*, No. 02-05-00046-CR, 2006 WL 2034280, at *2 (Tex. App.—Fort Worth July 20, 2006, pet. ref'd) (mem. op., not designated for publication) (holding that in the guilt phase of an aggravated kidnapping trial, the prosecutor properly argued, "I want you to be careful for some unsuspecting female who might encounter [the defendant] at a later date."); *Piatt v. State*, No. 01-00-00102-CR, 2001 WL 361324, at *2 (Tex. App.—Houston [1st Dist.] Apr. 12, 2001, no pet.) (not designated for publication) ("The State's argument that nobody should be killed by a drunk driver looking like appellant is a proper plea for law enforcement."). We overrule appellant's second issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

18

TERRIE LIVINGSTON
CHIEF JUSTICE


PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 21, 2012